FILED
CLERK

8/18/2022 4:29 pm

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------X
SIMONA HEATH,

                          Plaintiff,

                                              MEMORANDUM & ORDER
         -against-                            20-CV-04367 (JS)

COMMISSIONER OF SOCIAL SECURITY,

                          Defendant.
---------------------------------------X
APPEARANCES
For Plaintiff:          Howard D. Olinsky, Esq.
                        Olinsky Law Group
                        250 South Clinton Street, Suite 210
                        Syracuse, New York  13202

For Defendant:          Dennis J. Canning, Esq.
                        Meghan McEvoy, Esq.
                        SSA - Office of the General Counsel
                        601 East 12th Street, Room 965
                        Kansas City, Missouri  64106

SEYBERT, District Judge:

         Plaintiff Simona Heath ("Plaintiff") brings this action
pursuant to Section 205(g) of the Social Security Act (the "Act"),
42 U.S.C. § 405(g), challenging the denial of her application for
Social Security Disability Insurance Benefits by the Commissioner
of Social Security (the "Commissioner"). (Compl., ECF No. 1, ¶¶ 1-
2.)  Presently pending before the Court are the parties' cross-
motions for judgment on the pleadings.  (Pl. Mot., ECF No. 17;
Comm'r Mot., ECF No. 21.)  For the following reasons, Plaintiff's
motion (ECF No. 17.) is DENIED, and the Commissioner's motion (ECF
No. 21) is GRANTED.

BACKGROUND[1]

I.   Procedural History

On January 6, 2017, Plaintiff completed applications for Title II disability insurance benefits and Title XVI supplemental security income benefits alleging disability as of September 12, 2012, due to post-traumatic syndrome, high blood pressure, depression, pain in her knees and shoulders, asthma, major depressive disorder, generalized anxiety disorder, hypertension, and osteoarthritis of the back.  (R. 248-58, 324.)  After Plaintiff's claim was denied on March 23, 2017 (R. 94-95), she requested a hearing before an Administrative Law Judge ("ALJ").  (R. 144-58.)  On June 10, 2019, Plaintiff, accompanied by a representative, appeared for a video hearing before ALJ Brien Horan (the "Hearing").  (R. 31-71.)  Waren D. Maxim, a vocational expert, also testified at the Hearing.  Vocational interrogatories were obtained after the hearing and duly proffered to the Plaintiff's representative.  (R. 394, 397.)  In response, Plaintiff's representative requested a supplemental hearing to examine the vocational expert (R. 400), which was held by video on July 18,

_____

[1] The background is derived from the administrative record filed by the Commissioner on April 20, 2021.  (See ECF No. 11.)  For purposes of this Memorandum and Order, familiarity with the administrative record is presumed.  The Court's discussion of the evidence is limited to the challenges and responses raised in the parties' briefs.  Hereafter, the administrative record will be denoted "R.".

2019.  (R. 73-93.)  Plaintiff amended her alleged onset date of disability to July 25, 2016. (R. 277.)

In a decision dated July 29, 2019, the ALJ found that Plaintiff was not disabled.  (R. 13-24.)  On July 17, 2020, the Social Security Administration's Appeals Council denied Plaintiff's request for review, and the ALJ's decision became the final decision of the Commissioner.  (R. 1-6.)

Plaintiff initiated this action on September 17, 2020 (see Compl.) and moved for judgment on the pleadings on October 15, 2021 (Pl. Mot.; Pl. Support Memo, ECF No. 18.)  On January 10, 2022, the Commissioner filed a cross-motion for judgment on the pleadings (Comm'r Mot.; Comm'r Support Memo, ECF No. 21-1), and on February 3, 2022, Plaintiff filed her reply (Pl. Reply, ECF No. 22).

## II.  Evidence Presented to the ALJ

The Court first summarizes Plaintiff's testimonial evidence and employment history before turning to Plaintiff's medical records and the vocational expert's testimony.

### A.   Testimonial Evidence and Employment History

Plaintiff was born in 1956.  (R. 248.)  At the time of the Hearing, Plaintiff was sixty-two years old and lived alone in a two-story, single-family home.  (R. 38.)  Plaintiff completed four or more years college and has a biology degree.  (R. 62, 308, 325.)  Plaintiff testified that she worked as a substitute teacher

in 2000 and 2001, a medical clinic manger from 2004 to 2010, and a medical records administrator from July 2010 to September 2012. (R. 291, 326.)

Plaintiff testified that in 2012, she left her job as a medical records administrator due to symptoms of black mold ingestion. (R. 43.) According to Plaintiff, she would archive records that were located in five different areas in a large facility, one of which had black mold. (R. 44.)

Plaintiff testified that in 2013, she began treatment for depression with Dr. Delgado, a psychiatrist. (R. 44.) Plaintiff testified that around that time she began to experience symptoms of depression, anxiety, and sleeplessness. (R. 44.) Plaintiff testified that she treats with Dr. Delgado at least once every three months. (R. 44-45.) Plaintiff does not see a counselor or therapist. (R. 58.) According to Plaintiff, she has been on medication and finds that she is "at an even level." (R. 45.) Plaintiff testified that she requires medication for sleep due to anxiety. (R. 45.) With respect to her mental limitations, Plaintiff testified that she can concentrate for 30 minutes before her anxiety causes her to lose focus, and she becomes tired because of her medications. (R. 46.)

Plaintiff testified that in 2016, she sought orthopedic treatment for right shoulder pain. (R. 46-47.) Plaintiff further testified she developed knee problems in 2016 or 2017. (R. 47.)

According to the Plaintiff, she did not start treatment for her knees until 2018 because it was not "to the point where it impeded [her] from working." (R. 47.) Plaintiff testified that she received one set of cortisone injections in her knees at the time of the Hearing. (R. 49.) Plaintiff further testified that she takes Cetirizine for her knee and right shoulder pain. (R. 49.) Plaintiff testified that she still experiences pain daily, albeit with less swelling. (R. 47.)

With respect to her physical limitations, Plaintiff testified that since 2018, she could walk no more than 20 minutes before the knee pain becomes "too much" for her. (R. 48.) Plaintiff testified that she could stand in one spot for about 20 minutes before having to move onto something for support. (R. 48.) She further stated that she has difficulty repeatedly lifting objects throughout the day. (R. 48.) Specifically, she claims she cannot lift five pounds repetitively. (R. 48.) With respect to her daily activities, Plaintiff testified that she is not able to climb on a ladder to reach for things, reach up high for things, garden, or bend down. (R. 50.) Plaintiff further stated that she can drive, and bathe and dress herself. (R. 50-51.) Plaintiff's relatives help her with groceries and yardwork. (R. 50-51.)

Next, Plaintiff testified regarding her work as a substitute/teacher's aide during the 2017-1018 and the 2018-2019 school years. (R. 52, 60.) According to Plaintiff, she left her

medical records manager position because of exposure to mold and to avoid lifting and bending.  (R. 51.)  Plaintiff further testified that she went into teaching because she thought it would be better for her symptoms; however, she found the school was "dusty" and "moldy."  (R. 51.)  While Plaintiff testified that her inhaler was effective when she used it, she admitted she did not use the inhaler daily as recommended because other prescribed medications kept her asthma "at bay."  (R. 51-52, 59.)  Plaintiff testified that she requested that the school decrease her hours "from a few days a week to two days to one day to eventually none." (R. 52.)  Plaintiff made this request because of the "activity with the children," which required climbing up three sets of stairs a few times a day.  (R. 52.)  Plaintiff testified that she could not perform these activities because of her knee.  (R. 52.)  In addition to environmental irritants, Plaintiff testified that exertion brings about her asthma.  (R. 53.)  According to Plaintiff, at times her job as a teacher's aide required her to contain children with behavior problems for 15 to 20 minutes, which caused changes in her breathing and anxiety.  (R. 53, 61.)

Plaintiff testified that, at the time of the Hearing, she was part of the Office of People with Developmental Disabilities program that placed individuals with disabilities in her home to stay.  (R. 55.)  Plaintiff testified that she would prepare meals for them, wash their clothing, schedule their

doctor's appointments, and clean for them.  (R. 56.)  Plaintiff testified that she housed three individuals at most.  (R. 56.) According to Plaintiff, the disabled individuals would attend programs outside the Plaintiff's home during the day.  (R. 56.) At the time of the Hearing, Plaintiff testified that she had one person at her house.  (R. 56.)

      B.    <u>Medical Evidence</u>

          1.   <u>Prior to the Amended Alleged Onset Date</u>

In April 2013, Plaintiff initiated treatment with Miguel Delgado, M.D. ("Dr. Delgado") for depression.  (R. 301, 498.) Plaintiff reported depression starting in 1999.  (R. 301-03.) Plaintiff's mood was observed to be dysphoric with fair memory and symptoms of insomnia.  (R. 498.)  Dr. Delgado diagnosed Plaintiff with recurrent moderate major depressive disorder.  (R. 303.)  Dr. Delgado prescribed Effexor and Remeron.  (R. 303.)

On March 26, 2014, Plaintiff returned to Dr. Delgado. (R. 499.)  Plaintiff's symptoms of depression had increased in severity.  (R. 499.)  Plaintiff's mood was observed to be dysphoric, and her speech was slowed.  (R. 499.)

On June 6, 2014, Plaintiff had a follow-up visit with Dr. Delgado. (R. 501.)  Dr. Delgado noted Plaintiff's symptoms of depression had decreased in severity.  (R. 501.)  In addition, Dr. Delgado noted Plaintiff experienced blunting of her responses to events that otherwise would make her sad.  (R. 501.)

On October 21, 2014, Plaintiff returned to Dr. Delgado. (R. 503.)  Dr. Delgado observed Plaintiff's symptoms of anxiety and depression remained the same.  (R. 503.)  Dr. Delgado's treatment notes indicate that Plaintiff seemed "almost paranoid and hypomanic in the office" as she seemed "overly preoccupied with issues, hyperverbal and overinclusive."  (R. 503.) Plaintiff's sleep was noted as poor.  (R. 503.)  Dr. Delgado observed Plaintiff's gait/station to have psychomotor retardation and her affect was blunted.  (R. 503.)  These findings were largely unchanged at a subsequent November 19, 2014 visit.  (R. 505-06.) Plaintiff and Dr. Delgado discussed her Klonopin prescription at the visit.  (R. 505.)  Plaintiff continued to treat with Dr. Delgado through 2015.  (R. 507-16.)

On April 12, 2016, after eighteen months, Plaintiff returned to Dr. Delgado and told Dr. Delgado that she felt well overall and was stable on her current medications.  (R. 515-16, 579.)  Dr. Delgado's mental status exam ("MSE") showed that Plaintiff was cooperative with unremarkable psychomotor activity, appropriate appearance, normal speech and affect, euthymic mood, organized and relevant thoughts, and adequate attention.  (R. 579.)

## 2.  After the Amended Alleged Onset Date

On July 25, 2016, Plaintiff sought care from Jeffery Muhlrad, M.D. ("Dr. Muhlrad"), an orthopedic provider, for right shoulder pain of four years' duration.  (R. 804.)  On initial

examination, Dr. Muhlrad found appropriate mood and affect, no right shoulder tenderness, no increased warmth, no crepitus on range of motion, and good or normal muscle strength. (R. 804-05.) Dr. Muhlrad wrote that Plaintiff's right shoulder pain appeared to be due to tendinopathy and acromioclavicular arthritis changes. (R. 805.) Dr. Muhlrad prescribed physical therapy for Plaintiff's tendinopathy of right shoulder and prescribed Voltaren gel for Plaintiff's symptoms of acromioclavicular arthritis. (R. 805.) He instructed Plaintiff to follow up if her symptoms worsened. (R. 805.) Results from right shoulder imaging taken that same day showed mild narrowing and degenerative change at the acromioclavicular joint. (R. 798.) The results also showed that there was no definitive acute fracture dislocation of the right shoulder. (R. 798.)

On September 29, 2016, Plaintiff returned to Dr. Delgado. (R. 517.) Plaintiff told Dr. Delgado that she felt well but was frustrated over her inability to find a job in the state system so her pension would kick in at her retirement. (R. 517.) Plaintiff reported sleeping 6-8 hours per night. (R. 517.) Plaintiff denied depressed mood, anxiety, confusion, sleep difficulty, and medication side effects. (R. 517.) Dr. Delgado noted that Plaintiff's symptoms were controlled with medication, that she was doing well medically, and that she worked. (R. 517.) The MSE showed that Plaintiff was cooperative, with normal speech,

psychometry activity, affect, and mood; and displayed adequate attention with organized and relevant thoughts and good judgment. (R. 517.)  Dr. Delgado wrote that no medication adjustments were needed.  (R. 518.)

On October 26, 2016, Plaintiff sought care from Jordana Rothschild, M.D. ("Dr. Rothschild") for symptoms related to mold exposure that Plaintiff alleged she experienced from 2010 to 2012. (R. 527-28.)  Plaintiff stated that while she worked as a medical records administrator from July 2010 to September 2012, she was required to clean out old records that were archived in an old basement with rodent infestation, water damage, humidity, mold, no sunlight, and poor ventilation.  (R. 527.)  Plaintiff alleged that when she entered the basement, she would feel tired, itchy, dizzy, and developed wheezing, coughing, anxiety, and depression.  (R. 528.)  Upon physical examination, Dr. Rothschild found Plaintiff was in no respiratory distress, normal respiratory rhythm and effort, and no accessory muscle use.  (R. 528.)  Some scattered wheezing was heard on auscultation, however.  (R. 528.)  Plaintiff had normal gait, no joint swelling, intact insight and judgment, and normal mood and affect.  (R. 528.)  Dr. Rothchild assessed history of mold exposure and diagnosed Plaintiff with probable mold-induced mild intermitted asthma.  (R. 528.)  Plaintiff's Spirometry was normal.  (R. 528.)  Dr. Rothschild prescribed Singulair daily with an albuterol rescue inhaler.  (R. 528.)

From April 2017 to April 2019 Plaintiff visited Christina Ramogoolam, D.O., her primary care provider. (R. 703.) Examination on April 25, 2017, showed that Plaintiff ambulated normally and had good respiratory effort without wheezing, rales, crackles or rhonchi. (R. 703, 710, 719). Plaintiff exhibited normal breath sounds, good air movement, normal gait and station, normal motor tone and strength, and normal movement extremities. (R. 703, 710, 719.) Plaintiff displayed normal mood and affect, good judgment, and normal recent and remote memory. (R. 703, 710, 719.) In addition, Plaintiff's asthma was noted to be stable with medication. (R. 703.) These findings remained the same at her visits on March 6, 2018, and September 18, 2018. (R. 703, 710, 719.)

April 13, 2017, Plaintiff returned to Dr. Delgado. (R. 585.) Dr. Delgado noted that Plaintiff, although stressed due to her finical situation, "continues to feel relatively stable." (R. 585.) Plaintiff reported being depressed, "on the verge of crying," anhedonic, and apathetic, with a worsening sense of helplessness. (R. 587.) Plaintiff said she had been distressed because she had neglected her yard, as she had been always very involved in caring for her landscape. (R. 587.) MSE showed constricted affect, depressed mood, and psychomotor retardation. (R. 587.) Plaintiff had normal and soft speech; organized, relevant, and helplessness thoughts; and adequate judgment and

attention.  (R. 587.)  Dr. Delgado increased Plaintiff's Effexor dosage and told Plaintiff to take additional Klonopin if needed. (R. 587.)

Plaintiff returned to Dr. Delgado on October 24, 2017 and denied any acute symptoms.  (R. 584.)  Plaintiff told Dr. Delgado that she sometimes experienced insomnia when she did not take the Klonopin but stated that she has a full night sleep when she took the medication.  (R. 584.)  Plaintiff denied medication side effects.  (R. 584.)  In addition, Plaintiff noted that she continued work as a substitute teacher and denied medical issues. (R. 584.)  Plaintiff's MSE findings remained the same from her visit on September 29, 2016.  (R. 584-585.)  In a return visit dated March 27, 2018, Dr. Delgado noted that Plaintiff denied acute symptoms, which corroborated his own observation.  (R. 588.) Plaintiff denied depressed mood, anxiety, sleep difficulty, medication side effects, and acute medical issues.  (R. 588.) Plaintiff reported that she was still working.  (R. 588.)  Again, Plaintiff's MSE findings were unchanged.  (R. 586.)

On August 14, 2018, Plaintiff saw Ambka Sabiki  ("Ms. Sabiki"), a physician's assistant, to test for mold allergies. (R. 833.)  Plaintiff reported increased shortness of breath while working in older buildings.  (R. 833.)  Plaintiff was on Singulair and used a ProAir inhaler 3-4 times a week, which helped.  (R. 833.)  General examination showed that Plaintiff's lungs were clear

to auscultation with no chest wall tenderness, good air exchange, and normal symmetric chest expansion.  (R. 834.)  Ms. Sabiki wrote that Spirometry testing showed improvement with Albuterol administration.  (R. 834.)  Skin testing was negative for mold and positive for dust mites, trees, grass, and other allergens.  (R. 834.)  Ms. Sabiki diagnosed Plaintiff with allergic rhinitis and uncomplicated mild persistent asthma.  (R. 834.)  Ms. Sabiki prescribed Plaintiff an allergy tablet, a daily inhaler, recommended Plaintiff use her ProAir inhaler four times a day, and advised her to continue Singulair.  (R. 834.)  Pulmonary function test results showed obstruction with possible restriction, which was noted to be "relatively normal."  (R. 826, 841.)

On August 22, 2018, Plaintiff returned to Dr. Muhlrad. (R. 807.)  Plaintiff alleged bilateral knee pain exacerbated by climbing stairs.  (R. 807.)  Plaintiff reported that Tylenol and Aleve provided limited relief.  (R. 807.)  Plaintiff had treated her right shoulder pain with Voltaren gel but ceased using it after she ran out.  (R. 807.)  Examination of the right and left knee showed no abnormal swelling, instability, or malalignment, and apprehension sign was negative.  (R. 808.)  Examination of the right knee revealed crepitus on range of motion of the femoral tibial joint surface.  (R. 808.)  In addition, examination of the left knee revealed point tenderness to palpation along the medial joint line or about the pes anserine bursa or medial collateral

13

ligament bursa region. (R. 808.) X-ray examination of the left knee, performed that day, revealed advanced medical compartment predominant arthritis with complete loss of joint space, exostosis in the medial aspect of the proximal tibia, cyst with small osteophyte formation, and small-to-moderate knee joint effusion. (R. 800, 808.) X-ray examination of the right knee showed moderate joint space narrowing and severe osteoarthritis. (802, 808.) Dr. Muhlrad assessed primary osteoarthritis of both knees, arthritis of the right acromioclavicular joint, and right shoulder tendinopathy. (R. 809.) Dr. Muhlrad administered a cortisone injection in each knee and prescribed Plaintiff meloxicam. (R. 809.)

On August 31, 2018, Plaintiff returned to Dr. Delgado, reporting that for the past several months she had been increasingly depressed. (R. 596.)

On October 5, 2018, Plaintiff returned to Melinda Anamdi, a physician's assistant in Ms. Sabiki's office, for a follow-up visit for allergies and asthma. (R. 830.) Plaintiff, despite her not having positive skin test to mold, reported that she still felt symptoms when exposed to mold. (R. 830.) Plaintiff reported that a cough and a great many exertional symptoms, including needing to climb stairs daily and participate in gym class with children at school for work. (R. 830.) Plaintiff used her ProAir inhaler "on occasion," which helped. (R. 830.)

Plaintiff stated that she felt better when she was not at school. (R. 830.)   Plaintiff's general examination results remained the same from her visit with Ms. Sabiki on August 14, 2018.  (R. 831, 835.)  Plaintiff's medications were adjusted.  (R. 831.)

On October 18, 2018, Plaintiff returned to Thitima Herfel, a physician's assistant in Dr. Muhlrad's office, to follow up on her left knee pain.  (R. 811.)   Plaintiff reported some improvement with cortisone injections and minimal improvement with Tylenol and meloxicam.  (R. 811.)   Plaintiff said climbing 50 stairs daily for work exacerbated her pain, however.  (R. 811.) Bilateral knee examination showed no erythema, ecchymosis, abrasion, effusion, or instability.  (R. 811-12.)   Examination showed medial joint line tenderness and range of motion from 3-130 degrees with femorotibial crepitus.  (R. 811-12.)   Surgical treatment options with total knee replacement were discussed, but Plaintiff declined and chose to continue with conservative treatment.  (R. 812.)

October 22, 2018, Plaintiff returned to Dr. Delgado and reported that she remained depressed without much improvement. (R. 594.)   Plaintiff refused to increase her Effexor to 150 mg as recommended, so Dr. Delgado increased it to 112.5 mg.  (R. 595.) Plaintiff complained of excessive sedation in the morning with Klonopin, so she did not take it every night, causing her to have problems sleeping.  (R. 595.)   Dr. Delgado prescribed shorter-

acting benzodiazepine and directed Plaintiff to stop the Klonopin, recommending instead that she begin a trial of 1 mg of Ativan. (R. 595.)  Plaintiff's MSE findings were similar to her findings on August 31, 2018.  (R. 595.)

On November 9, 2018, Plaintiff had a follow-up appointment with Ms. Anamdi for allergies and asthma.  (R. 826.) Plaintiff told Ms. Anamdi that she feels mold precipitates the bulk of her symptoms.  (R. 826.)  Plaintiff reported using Breo five out of the seven days.  (R. 826.)  Ms. Anamdi noted that Plaintiff was "not really compliant with her Singulair either," using it four out of seven days.  (R. 826.)  Plaintiff noted using her ProAir inhaler about three times per week.  (R. 826.)  Ms. Anamdi performed Spirometry testing, which revealed normal findings.  (R. 828.)  Ms. Anamdi wrote that Plaintiff "would do a lot better with remaining compliant with the Breo and Singulair" and that she "would have significant improvement" with a nasal spray.  (R. 828.)  Ms. Anamdi reinforced the idea of medication compliance and further prescribed Plaintiff Fluticasone Propionate spray.  (R. 828.)

On November 29, 2018, Plaintiff returned to Dr. Delgado. (R. 592.)  A treatment note from Dr. Delgado indicates that Plaintiff felt less depressed but continued to experience insomnia.  (R. 592.)  Dr. Delgado found Plaintiff's primary symptoms of depression had decreased in severity since her last

visit.  (R. 592.)  Plaintiff felt that Lorazepam was not helping her sleep.  (R. 592.)  Dr. Delgado re-prescribed the Plaintiff Klonopin.  (R. 593.)  Plaintiff's MSE findings were normal despite soft speech.  (R. 593.)

On November 15, 2018, November 29, 2018, and December 6, 2018, Plaintiff underwent bilateral knee euflexxa injections.  (R. 813, 815, 817.)

On January 11, 2019, Plaintiff had a follow-up visit with Shreya Desai, a physician's assistant, for allergies.  (R. 824.)  Plaintiff reported that she was doing "good" and denied shortness of breath, chest pain, wheezing, congestion, runny nose, and a cough.  (R. 824.)  Plaintiff's respiratory exam was normal. (R. 825.)  Spirometry testing was normal as well.  (R. 837.)

On February 28, 2019, Plaintiff returned to Dr. Delgado. (R. 591.)  Plaintiff denied acute symptoms, and Dr. Delgado wrote that he observed none in the office.  (R. 591.)  Plaintiff reported that her symptoms were controlled with medication and denied depressed mood, anxiety, medication side effects, and acute medical issues.  (R. 591.)  Plaintiff reported that she continued to work as a teacher's aide.  (R. 591.)  Plaintiff's MSE showed normal psychomotor activity, cooperative behavior, normal speech and affect, appropriate appearance, normal mood, organized and relevant thoughts, intact memory, and adequate judgment and

attention.  (R. 591.)  Plaintiff's medications remained the same.
(R. 592.)

    C.  Opinion Evidence

        On February 27, 2017, Plaintiff saw Paul Herman, Ph.D.
("Dr. Herman"), for a psychiatric consultative evaluation.  (568-
71.)  At the time, Plaintiff reported low mood and feelings of
tension and stress associated with inability to find suitable
employment and financial stressors.  (R. 568-69.)  Upon MSE,
Plaintiff was found to be cooperative with adequate social skills.
(R. 569.)  Plaintiff had normal motor behavior, eye contact,
speech, and affect.  (R. 569-70.)  Plaintiff had coherent and goal-
directed thoughts, intact attention and concentration, average
cognitive functioning, and fair insight and judgment.  (R. 569-
70.)  Plaintiff had intact recent memory skills and below average
remote memory skills, as she could only recall 1 out of 3 objects
after 5 minutes.  (R. 569-70.)  Dr. Herman opined that, from a
psychological perspective, there was no evidence of limitation
with respect to Plaintiff's ability to: understand, remember, or
apply simple or complex directions; use reason and judgment;
interact adequately; sustain concentration, consistence, routine
and attendance; regulate emotions, behavior, and well-being at a
level consistent for low-level employment; maintain personal
hygiene and appropriate attire; be aware of normal hazards; and
take appropriate risks.  (R. 570.)  Dr. Herman opined that the

results of the evaluation were inconsistent with psychiatric problems that would significantly interfere with Plaintiff's ability to function on a daily basis. (R. 570.) Dr. Herman diagnosed Plaintiff with "[a]djustment disorder with mixed anxiety and depressed mood, chronic." (R. 571.)

On February 27, 2017, Plaintiff saw Kanista Basnayake, M.D. ("Dr. Basnayake") for an internal medicine consultative examination. (R. 573-77.) At the time, Plaintiff reported high blood pressure, asthma and allergies, and joint pain. (R. 573.) Plaintiff did not attend physical therapy despite being told to do so. (R. 573.) Plaintiff stated that the joint pain improved with Tylenol or Aleve. (R. 573.) Upon physical examination, Plaintiff walked with a normal gait and stance, walked on her heels and toes without difficulty, squatted to one third of full, used no assistive device to walk, rose from her chair without difficulty, and needed no help changing for the examination or getting on and off the examination table. (R. 574.) Plaintiff's lungs were clear to auscultation with normal percussion and normal diaphragmatic motion, with no significant chest wall abnormality. (R. 575.) Plaintiff had full range of motion in her cervical and lumbar spine, shoulders, knees, hips, ankles, elbows, forearms, and wrists. (R. 575.) Plaintiff's straight leg raise was negative bilaterally. (R. 575.) Plaintiff exhibited normal sensation, full (5/5) arm and leg strength, intact hand and finger dexterity,

and full bilateral grip strength.  (R. 575.)  Dr. Basnayake opined that Plaintiff should avoid smoke, dust, and known respiratory irritants given her history of asthma.  (R. 576.)  Dr. Basnayake further opined that due to pain in Plaintiff's back, shoulder, and hip, Plaintiff has a mild limitation for prolonged sitting, standing, walking, climbing, bending, lifting, carrying, and kneeling.  (R. 576.)

On March 1, 2017, Plaintiff saw Dr. Harding, a non-examining State Agency psychological consultant.  (R. 104.)  Dr. Harding determined that Plaintiff has mild limitations in her ability to: understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage herself.  (R. 104.)  Dr. Harding found Plaintiff's mental impairments are non-severe.  (R. 104-05, 119-20.)

On July 3, 2019, Dr. Delgado completed a medical source statement of Plaintiff's mental ability to do work-related activities.  (R. 844.)  Dr. Delgado assessed moderate limitations in Plaintiff's ability to make judgments on simple work-related decisions.  (R. 844.)  Dr. Delgado assessed marked limitations in Plaintiff's ability to understand, remember and carry out complex instructions due to Plaintiff's inability to sustain stress for a "long time."  (R. 844.)  Dr. Delgado assessed marked limitations in Plaintiff's ability to respond appropriately to usual work situations and to changes in a routine work setting due to stress.

(R. 845.)  Dr. Delgado also opined that Plaintiff may have sadness, anhedonia, helplessness, and poor concentration with intermittently impaired cognition due to depression.  (R. 845.)  Dr. Delgado noted that Plaintiff showed symptoms including insomnia and lack of appetite when decompensating.  (R. 845.)

     D.   <u>Vocational Expert's Testimony</u>

        At the Hearing, the vocational expert ("VE") Warren Maxin testified that Plaintiff worked as a medical records director, which was a light exertion level, very skilled job; teacher's aide/teacher jobs, which were both light positions with specific vocational preparation levels of 6 (teacher's aide) and 7 (teacher).  (R. 63.)  When asked to consider a hypothetical individual with Plaintiff's work background, educational background, and age, who was limited to medium work with rare exposure to pulmonary irritants such as fumes, odors, gases, and poor ventilation; frequent reaching with the right shoulder; frequent balancing, stooping, crouching, kneeling and climbing ramps and stairs; and occasional climbing of ladders, ropes and scaffolds, the VE testified that such an individual could perform Plaintiff's past relevant work as a medical records director.  (R. 64.)  When the ALJ added limitations of only occasional kneeling and crouching and rare climbing of ladders, ropes, and scaffolds, the VE indicated that the individual would still be capable of performing Plaintiff's past relevant work.  (R. 65-65.)  However,

the VE testified that if the same individual were limited to simple, routine tasks, the past relevant work could not be performed.  (R. 65.)  The VE was subsequently asked to consider a hypothetical individual with a full range of sedentary work with rare exposure to pulmonary irritants; frequent reaching with the right shoulder; frequent balancing, stooping, and climbing of ramps and stairs; occasional crouching and kneeling; and no climbing of ladders, ropes, and scaffolds.  (R. 67.)  The VE opined that the hypothetical individual would have transferable skills from past work as medical records director and could perform sedentary jobs such as a telephone answering service operator and receptionist.  (R. 67. )  The VE further testified that if an individual were to be off task 10 percent of the workday, all work would be precluded.  (R. 68.)

At the second hearing on July 18, 2019, the VE testified that if Plaintiff were limited to simple routine and repetitive tasks, she would not be able to perform her past relevant work. (R. 82.)  Further, the VE testified that Plaintiff had transferable skills to the sedentary positions of telephone answering service operator, receptionist, and data entry clerk.  (R. 80, 86-87.)

DISCUSSION

I.   Standard of Review

In reviewing the ruling of an ALJ, the Court does not determine de novo whether the plaintiff is entitled to disability

benefits.  Thus, even if the Court may have reached a different decision, it must not substitute its own judgment for that of the ALJ.  See Colgan v. Kijakazi, 22 F.4th 353, 359 (2d Cir. 2022); see also Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir. 1991).  If the Court finds that substantial evidence exists to support the Commissioner's decision, the decision will be upheld, even if evidence to the contrary exists.  See Johnson v. Barnhart, 269 F. Supp. 2d 82, 84 (E.D.N.Y. 2003).

II.   The ALJ's Decision

A.   The Five-Step Disability Analysis

Initially, the ALJ found that Plaintiff meets the insured-status requirements of her claim through December 31, 2020.  (R. 14.)  Next, the ALJ applied the familiar five-step disability analysis and concluded that Plaintiff was not disabled from July 25, 2016, the alleged disability-onset date, through July 29, 2019, the date of the decision.  (R. 16-24); see also 20 C.F.R. § 404.1520.  At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since July 25, 2016, the amended alleged onset date.  (R. 16.)  The ALJ reasoned that although the Plaintiff worked after the amended disability onset date, the work activity did not rise to the level of substantial gainful activity.  (R. 16.)

At step two, the ALJ found that Plaintiff, as of March 2018, had severe impairments consisting of asthma and

23

osteoarthritis of the knees. (R. 16.) However, the ALJ found
Plaintiff's claims of obesity, hypertension, right shoulder
degenerative changes/tendinopathy, depression, and anxiety to be
non-severe impairments. (R. 16.) With respect to Plaintiff's
claims of hypertension, the ALJ noted that Plaintiff's
hypertension has been treated and is under control with medication.
(R. 16.) With respect to Plaintiff's claims of obesity, the ALJ
noted that as of November 2018, Plaintiff's body mass index of
30.27 was only slightly above 30 for obesity. (R. 17.) With
respect to Plaintiff's diagnosis of tendinopathy and mild
narrowing and degenerative change at the right shoulder AC joint
in July 2016, the ALJ noted that Plaintiff was referred to physical
therapy. (R. 17.) But, as the ALJ noted, Plaintiff has neither
gone to physical therapy since February 2017 nor returned to
orthopedics until August 2018, which was for her knee rather than
her shoulder. (R. 17.)

       With respect to Plaintiff's mental health impairments,
the ALJ began by acknowledging that Dr. Delgado has been
Plaintiff's treating mental health provider since 2013. (R. 17.)
The ALJ recognized that Dr. Delgado, in a submission dated July
2019, assessed Plaintiff with markedly reduced abilities to deal
with complex work and respond to changes in a routine work setting
and an at least moderate restriction in making judgments on simple
work-related decisions. (R. 17-18.) Nonetheless, the ALJ decided

to give Dr. Delgado's decision "little weight" because it was not consistent with the record as a whole. (R. 18.) First, the ALJ found that Dr. Delgado's opinion is unsupported by Plaintiff's own hearing testimony that she is accustomed to her medication side effects, she has only some anxiety and sleeplessness, and her medication is helpful. (R. 18.) Second, the ALJ reasoned that Dr. Delgado's decision is unsupported by his own treatment notes, which show only modest symptom complaints and routine mental status examinations. (R. 18.) The ALJ discussed, in detail, Dr. Delgado's treatment notes, which stated the following: In June 2014, Plaintiff's mood was euthymic, Plaintiff was sleeping well and had no cognitive defects, and Plaintiff's mental status examinations were normal; in February 2015, Plaintiff's symptoms were noted to be well controlled and Plaintiff reported good relationships with her family; in June 2015, Plaintiff denied any symptoms, was tolerating medications well, with no side effects, and reported to work from home and was "continuing to function well in all areas"; and in 2016, Plaintiff reported feeling well. (R. 17.) The ALJ observed that the subsequent treatment notes and records proceed in similar manner, with Plaintiff reporting only modest symptoms or that she is doing well, and that Plaintiff presented routine mental status examinations. (R. 17.) Third, the ALJ noted that the frequency of Plaintiff's treatment with Dr. Delgado, visiting only once every 3 to 5 months, appears more

consistent with the treatment of modest rather than marked symptoms. (R. 18.) Last, the ALJ reasoned that Dr. Delgado's findings "fly in the face" of Plaintiff's part time work as a substitute teacher, a teacher's aide, caring for disabled adults at her home, and her pursuit of an MBA to within 4 courses of completion. (R. 18.)

In addition, the ALJ gave the opinion of consultative examiner, Dr. Herman, "significant weight" in finding Plaintiff's mental impairments not severe. (R. 17.) The ALJ relied on Dr. Herman's opinion that Plaintiff did not appear to have an impairment that would interfere with her ability to function vocationally. (R. 17.) The ALJ noted that Dr. Herman's findings were consistent with the treatment notes of Dr. Delgado and the State Agency psychological consultant's opinion, albeit inconsistent with Dr. Delgado's limitation assessment of Plaintiff from 2019. (R. 17.).

In addition to the above reasoning, the ALJ considered the four broad functional areas known as the paragraph B criteria in finding that Plaintiff's mental impairments are non-severe. (R. 18.) With respect to the first functional area of understanding, remembering, or applying information, the ALJ found that Plaintiff had no more than a mild limitation. (R. 18.) The ALJ reasoned that Plaintiff's memory was noted to be normal and her fund of knowledge and cognitive abilities were noted to be

good.  (R. 18.)  With respect to the second functional area of interacting with others, the ALJ found that Plaintiff had no more than a mild limitation.  (R. 18.)  The ALJ reasoned that Plaintiff reported working and taking care of others; having good family relationships; going on family trips; and dealing with students in her part time work.  (R. 18.)  With respect to the third functional area of concentrating, persisting, or maintaining pace, the ALJ found that Plaintiff had a mild limitation.  (R. 18.)  The ALJ reasoned that Plaintiff's concentration and attention were noted to be normal; Plaintiff was able to teach science courses and wanted to go back to school for her MBA; and Plaintiff, during the hearing, expressed disagreement with the VE's opinion, displaying an ability to articulate complex and nuanced concepts.  (R. 18-19.)  With respect to the fourth functional area of adapting or managing oneself, the ALJ found that Plaintiff had no limitation. (R. 19)  The ALJ reasoned that Plaintiff takes care of disabled adults in her home, works as a teacher's aide, and responded well to medication management.  (R. 19.)

Moving to step three, the ALJ found that Plaintiff's impairments did not meet or medically equal the severity of any of the impairments listed in Appendix 1 of the Social Security regulations (R. 19.)

Next, considering the entire record, and not just Plaintiff's severe impairments, the ALJ determined that from July

25, 2016, until March 22, 2018, Plaintiff had the residual functional capacity ("RFC") to perform medium work, except:

> (1) rare exposure to pulmonary irritants such as fumes, odors, gases, poor ventilation; (2) frequent reaching with right shoulder and frequent balancing, stooping, crouching, kneeling, and climbing ramps and stairs; occasional climbing of ladders, ropes or scaffolds.

(R. 19.) Next, the ALJ determined that Plaintiff, as of March 22, 2018, had the RFC to perform sedentary work, except:

> (1) rare exposure (that is, 1% to 5% of the work day) to pulmonary irritants such as fumes, odors, gases, poor ventilation; and (2) frequent reaching with right shoulder and frequent balancing, stooping, crouching, kneeling, and climbing of ramps and stairs but only occasional climbing of ladders, ropes or scaffolds.

To support the RFC determination, the ALJ first summarized Plaintiff's hearing testimony. (R. 20.) The ALJ observed that Plaintiff testified that she stopped working in 2012 because of exposure to black mold and began to experience anxiety, insomnia, and depression in 2013; and discussed Plaintiff's testimony about medications and psychiatrist visits, her knee issues and cortisone injections, and that she can walk 20 minutes, stand for 10 minutes, lift 5 pounds, and takes medications for right shoulder pain. (R. 20.)

Next, the ALJ considered the medical record as to Plaintiff's asthma and mold exposure. (R. 20.) The ALJ began by

observing that Plaintiff reported that she stopped working in 2012 due to long-term exposure to mold, which affected her allergies and asthma. (R. 20.) The ALJ recognized that Plaintiff was diagnosed with probable mold-induced mild intermittent asthma in October 2016. (R. 20.) However, the ALJ noted that Plaintiff's Spirometry testing was normal, although there was scattered wheezing. (R. 20.) The ALJ addressed Plaintiff's admission that she was not compliant with taking her medications as prescribed and noted that Plaintiff had been advised to be more compliant. (R. 20.) The ALJ also summarized examination findings from 2019, observing that Plaintiff's pulmonary function tests were normal, and her Inhaled Nitrous Oxide test was 31, noted to be high. (R. 20.) Further, the ALJ noted that Plaintiff's skin testing was negative for mold, but positive for dust mites. (R. 20.) As the ALJ pointed out, Plaintiff did not pursue allergy testing until August 2018. (R. 20.) For these reasons, the ALJ limited Plaintiff's exposure to rare pulmonary irritants such as fumes, odors, gases, and poor ventilation due to her asthma and allergy symptoms. (R. 20-21.)

Next, the ALJ considered the medical record as to Plaintiff's orthopedic bilateral knee pain. (R. 21.) The ALJ summarized Plaintiffs X-rays of both knees, performed in 2018, observing that it showed severe osteoarthritis. (R. 21.) In addition, the ALJ noted that on examination there was some

crepitus, but no instability.   (R. 21.)   The ALJ noted that Plaintiff received a series of injections for her knees.   The ALJ observed that Plaintiff was recommended to receive surgery, and noted Plaintiff was not "interested."   In any event, the ALJ gave Plaintiff "the benefit of the doubt" that her knee symptoms worsened in early 2018 and that she had to wait for an orthopedic appointment; therefore, the ALJ limited Plaintiff to sedentary work as of March 22, 2018.   (R. 21.)

The ALJ found that Plaintiff's daily activities are "not limited to the extent one would expect," given her complaints of disabling symptoms and limitations.   (R. 21.)   To support this conclusion, the ALJ noted that Plaintiff cares for up to three disabled individuals in her home, prepares their meals, washes their clothes, makes their doctors' appointments, and helps with their daily living.   (R. 21.)   In addition, the ALJ noted that Plaintiff has been caring for these individuals since 2016, during which time she worked as a substitute teacher.   (R. 21.)

Next, the ALJ turned to opinion evidence.   (R. 21.)   The ALJ noted that Dr. Basnayake opined that Plaintiff should avoid dust, smoke and known respiratory irritants.   (R. 21.)   However, because Plaintiff was noncompliant with medication and had a normal Spirometry, the ALJ decided to give "some" weight to Dr. Basnayake's opinion, limiting Plaintiff to rare exposure, rather than none.   (R. 21.)   The ALJ also addressed Dr. Basnayake's

opinion that Plaintiff had a "mild" limitation for prolonged sitting, standing, walking, climbing, bending, lifting, carrying, and kneeling, noting that Dr. Basnayake's assessment was not specific, and it was unclear what mild means. (R. 21.) Nevertheless, the ALJ reasoned that Dr. Basnayake's assessment appears consistent with medium work for the period prior to March 22, 2018. (R. 21.)

Proceeding to step four, the ALJ found that prior to March 22, 2018, Plaintiff was capable of performing her past work as a medical records manager. (R. 22.)  The ALJ accepted the VE's testimony that the work did not require the performance of work-related activities precluded by Plaintiff's RFC. (R. 21.) However, the ALJ found that as of March 22, 2018, Plaintiff was no longer capable of performing any past relevant work and therefore has been limited to sedentary work. (R. 21.)  Again, the ALJ accepted the VE's testimony that Plaintiff would not be able to perform her past work, as it was performed at light. (R. 21.)

Nevertheless, at step five the ALJ concluded that "considering [Plaintiff's] age, education, work experience, and [RFC], [Plaintiff] has also acquired work skills from past relevant work that are transferable to other occupations with jobs existing in significant numbers in the national economy" such as answering service operator, receptionist, or data entry clerk. (R. 23.)

Accordingly, the ALJ determined that Plaintiff is not disabled. (R. 24.)

III. Analysis

Plaintiff advances two arguments on appeal: (1) the ALJ's mental RFC is unsupported by substantial evidence as he failed to properly weigh the opinion of treating psychiatrist, Dr. Delgado; (2) the ALJ's RFC determinations are unsupported by substantial evidence, "as he improperly played doctor and created the RFC's whole cloth." (Pl. Support Memo at 13.)

A.   Treating Physician Rule

Plaintiff argues that the ALJ erred in giving "little weight" to the opinion of Dr. Delgado, Plaintiff's treating psychiatrist. Plaintiff relies primarily on treatment notes from a 2019 visit, wherein Dr. Delgado opined that Plaintiff had marked limitations in her ability to: understand and remember complex instructions; carry court complex instructions; make judgments on complex work decisions; and respond appropriately to casual work situations and changes in routine work settings. Moreover, Plaintiff contends the ALJ mischaracterized Plaintiff's testimony by failing to consider her testimony that her work at the school required "20 minutes of struggling with students and [that] this exertion would bring about changes in her breathing and anxiety." Plaintiff further argues that, contrary to the ALJ's decision, Dr. Delgado's opinion is supported by his treatment notes and that the

ALJ "selectively read from [Dr. Delgado's treatment notes] . . .
and relied on only those findings that best support his
conclusion." (Pl. Support Memo at 12.)   Plaintiff contends that
if the ALJ had properly weighed the opinion of Dr. Delgado, he
would have concluded that Plaintiff's RFC limited her to perform
jobs that involve simple routine and repetitive tasks. (Id. at
13.)   The Commissioner argues in response that the ALJ
appropriately gave Dr. Delgado's opinion little weight considering
its internal inconsistency and conflict with Plaintiff's testimony
and record as a whole.[2] (Comm'r Support Memo at 15-21.) The Court
agrees with the Commissioner on this point.

     The Court applies the treating physician rule because
Plaintiff filed her claim before March 27, 2017. See 20 C.F.R.
§ 404.1527.   The "treating physician rule" provides that the
medical opinions and reports of a claimant's treating physicians
are to be given "special evidentiary weight." Clark v. Comm'r of
Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998).   The regulations
state:

> Generally, we give more weight to medical
> opinions from your treating sources . . . .
> If we find that a treating source's medical
> opinion on the issue(s) of the nature and
> severity of your impairment(s) is well-
> supported by medically acceptable clinical and

---

[2] The Commissioner focuses on whether substantial evidence supports
the ALJ's decision that Plaintiff had no severe mental impairment
at step two, whereas Plaintiff focuses on whether the ALJ properly
weighed Dr. Delgado's opinion more generally in crafting the RFC.

> laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 404.1527(c)(2).  Thus, the opinion of a treating physician "need not be given controlling weight where [it is] contradicted by other substantial evidence in the record." Molina v. Colvin, No. 13-CV-4701, 2014 WL 3925303, at *2 (S.D.N.Y. Aug. 7, 2014) (internal quotation marks and citation omitted); Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004) ("Although the treating physician rule generally requires deference to the medical opinion of a claimant's treating physician . . . the opinion of the treating physician is not afforded controlling weight where . . . [the] treating physician issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts.")  When an ALJ decides to not to assign a treating physician's opinion controlling weight, he must consider a number of factors to determine the appropriate weight to assign, including: "(i) the frequency of the examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion."  20 C.F.R. §

404.1527(d)(2). Importantly, when a treating physician's opinions are inconsistent with even his own treatment notes, an ALJ may properly discount those opinions. <u>Halloran</u>, 362 F.3d at 32.

Here, the ALJ properly considered the factors mentioned above when deciding not to assign controlling weight to Dr. Delgado's opinion. To begin, the ALJ considered factor (i), reasoning "claimant . . . sees Dr. Delgado only once every 3 to 5 months, a frequency of treatment that would appear generally more consistent with treatment of someone with modest rather than marked symptoms."

As to factor (ii) -- the evidence in support of the Dr. Delgado's opinion -- Plaintiff argues that Dr. Delgado's opinion is supported by his treatment notes, contrary to the ALJ's finding. But Plaintiff's argument fails for several reasons. In the first instance, and as the Commissioner correctly points out, Plaintiff cites to Delgado's treatment notes from 2014 -- two years before the amended alleged onset date of disability -- in support of her contention that Dr. Delgado's longitudinal treatment history consistently supports a finding of disability. These treatment notes are therefore of limited value to the issue here. <u>See</u> <u>Andrews v. Berryhill</u>, No. 17-CV-6368, 2018 WL 2088064, at *5 (W.D.N.Y. May 4, 2018) (finding the ALJ appropriately gave little weight to treatment notes and opinions that pre-dated the alleged disability onset date). And although Plaintiff refers to time-

35

relevant treatment notes from April 13, 2017, when Plaintiff reported to be "on the verge of crying," Delgado's treatment notes from that time also report that Plaintiff continued to feel "relatively stable." Similarly, although Plaintiff cites to treatment notes from August 31, 2018, stating Plaintiff reported increased depression, in subsequent treatment notes from three months later -- also referenced by Plaintiff -- Plaintiff reported "feel[ing] less depressed." In addition, the ALJ considered treatment notes throughout the medical record that revealed Plaintiff had only modest symptom complaints and had routine mental status examinations. Notably, Plaintiff fails to address Dr. Delgado's treatment notes from a February 28, 2019 visit -- the closest visit to Delgado's limitation assessment -- wherein Plaintiff denied acute symptoms, reported that her symptoms were controlled with medication, and denied depressed mood, anxiety, medication side effects, and acute medical issues. Based on the foregoing, Plaintiff has failed to establish that her longitudinal treatment history before Dr. Delgado supports the restrictive opinion to which the ALJ gave little weight.

As to factor (iii) -- the consistency of Dr. Delgado's opinion with the record as a whole -- the ALJ reasoned that Dr. Delgado's limitation assessment is "inconsistent with [Plaintiff's] own hearing testimony that she has become accustomed to her medication side effects, she has only some anxiety and

36

sleeplessness, and her medication is helpful." In addition, the
ALJ concluded, and this Court agrees, that Dr. Delgado's limitation
findings are inconsistent with and "fly in the face of the
claimant's part-time work as a substitute teacher, a teacher's
aide, and a teacher of middle school science courses, not to
mention her caring for disabled adults at her home and pursuing an
MBA to within 4 courses of completion." Also, the ALJ noted that
Dr. Delgado's limitation assessment was inconsistent with
consultative examiner Dr. Herman's opinion that there was no
evidence of limitation with respect to Plaintiff's ability to:
understand, remember, or apply simple or complex directions, use
reason and judgment, interact adequately, sustain concentration,
consistence, routine and attendance, regulate emotions, behavior,
and well-being at a level consistent for low-level employment,
maintain personal hygiene and appropriate attire, be aware of
normal hazards, and take appropriate risks. In addition, Dr.
Herman opined that the results of the evaluation were inconsistent
with psychiatric problems that would significantly interfere with
Plaintiff's ability to function on a daily basis. In fact, the
ALJ found Dr. Herman's opinion was consistent with Delgado's
treatment notes, putting it at odds with Dr. Delgado's limitation
assessment. Last, the ALJ considered that Dr. Delgado's assessment
was inconsistent with the State Agency psychological consultant

opinion of Dr. Harding, who opined that Plaintiff has only "mild" limitations.

Further, the Court rejects Plaintiff's argument that the ALJ "mischaracterized" Plaintiff's testimony by not considering testimony that Plaintiff's work at the school required "20 minutes of struggling with students and this exertion would bring about changes in her breathing and anxiety" fails because, as the Commissioner rightly observes, Plaintiff further testified that she stopped her part-time work because of the physical demands of the job, such as lifting the children, not because of mental health issues.  While it is true that "a reason . . . that relies on a mischaracterization of the record cannot be a good reason," the Court finds that the ALJ did not mischaracterize any testimony. See Vay v. Comm'r of Soc. Sec., 382 F. Supp. 3d 267, 277 (W.D.N.Y. 2018) (quoting Wilson v. Colvin, 213 F. Supp. 3d 478, 485 (W.D.N.Y. 2016)).

Based on the foregoing analysis, the Court finds that the ALJ properly applied the factors in giving little weight to Dr. Delgado's limitation assessment.

B.    ALJ's RFC Determination

Next, Plaintiff argues that the ALJ's RFC determinations are unsupported by substantial evidence and created "whole cloth." To begin, Plaintiff argues that the ALJ accepted the vague limitations opined by Dr. Basnayake.  In other words, the Plaintiff

argues because Dr. Basnayake assessed Plaintiff had "mild limitations" "for prolonged sitting, standing, walking, climbing, bending, lifting, carrying and kneeling," without specifying what "mild" meant, the ALJ "could not rely on Dr. Basnayake's" opinion. (Pl. Support Memo at 14.)  The Commissioner responds that the ALJ appropriately relied on Dr. Basnayake's opinion, giving it "some weight."

The "Second Circuit has held that when compiling an RFC from the record, an ALJ may not rely on opinions that employ the terms 'moderate' and 'mild' absent additional information." Calo v. Comm'r of Soc. Sec., No. 20-CV-3559, 2021 WL 3617478, at *4 (E.D.N.Y. Aug. 16, 2021).  Nevertheless, where "the record contains sufficient evidence from which an ALJ can assess the [claimant's] residual functional capacity, a medical source statement or formal medical opinion is not necessarily required." Monroe v. Comm'r of Soc. Sec., 676 F. App'x 5, 9 (2d Cir. 2017) (citations omitted).

Although the ALJ admitted that Dr. Basnayake's assessment was "not specific" and that it is unclear what "mild means," the ALJ had additional information to support his RFC determination.  First, Dr. Basnayake's use of the term "mild" was not too vague because it was supported by an objective physical examination.  Dr. Basnayake found on physical examination that Plaintiff walked with a normal gait and stance, walked on her heels and toes without difficulty, squatted to one third of full, used

no assistive device to walk, rose from her chair without difficulty, and needed no help changing for the examination or getting on and off the examination table. See Collier v. Colvin, No. 15-CV-0230, 2016 WL 4400313, at *3 (W.D.N.Y. Aug. 17, 2016) (finding that the consultative examiner's use of the term "moderate" in describing the claimant's limitations was not too vague because it was supported by an objective physical examination and because the consultative examiner's medical source statement was not "uselessly vague"). In addition, the Court has reviewed the record in this case and finds the ALJ's RFC is consistent with and supported by both the medical and non-medical evidence. For example, Plaintiff testified that she developed knee problems in 2016 or 2017 but did not start treatment for her knees until 2018 because "it was not to the point where it impeded [her] from working." (R. 47.) Also, the ALJ had medical records from Plaintiff's July 25, 2016, visit with Dr. Muhlrad, her orthopedic provider, and had extensive medical records evidencing an increase in symptoms beginning 2018, which caused the ALJ to reduce the Plaintiff's RFC to sedentary work as of March 22, 2018. Therefore, the ALJ's RFC determination finding Plaintiff from July 25, 2016 to March 22, 2018, had an RFC to perform medium work, albeit with certain limitations, is consistent with the record as a whole.

Last, Plaintiff argues that the ALJ arbitrarily chose the date of March 22, 2018, as the date that Plaintiff became

capable of only sedentary work.  To be clear, Plaintiff does argue that the RFC limiting Plaintiff to sedentary work after that time is not supported by substantial evidence.  Rather, Plaintiff takes issue with the cutoff date, which she characterizes as arbitrary.

The Court finds that Plaintiff's argument falls flat. First, the ALJ explained that he "[gave] the claimant the benefit of the doubt that her knee symptoms worsened in early 2018 and she had to wait for an orthopedic appointment."  Thus, the March 22, 2018 cutoff date is a reasonable approximation.  In any event, while the ALJ could have been clearer in explaining the reasoning for the cutoff date, such a failure has not frustrated the Court's review of the RFCs, which are substantially supported by the record.  Therefore, the ALJ's finding of non-disabled would not be changed.  See Zabala v. Astrue, 595 F.3d 402, 409 (2d Cir. 2010) ("Where application of the correct legal principles to the record could lead only to the same conclusion, there is no need to require agency reconsideration.").

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

<u>CONCLUSION</u>

For the foregoing reasons, Plaintiff's motion (ECF No. 17) is DENIED as stated herein, and the Commissioner's motion (ECF No. 21) is GRANTED.

The Clerk of the Court is directed to enter judgment accordingly and mark this case CLOSED.

**SO ORDERED.**


/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated:      August _18_, 2022
            Central Islip, New York


42